1

2

3

4

5

6            IN THE UNITED STATES DISTRICT COURT

7          FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9    TERRELL LOVE,                          No. C 12-06068 JSW

10            Petitioner,                   **ORDER DENYING PETITION**
                                            **FOR WRIT OF HABEAS CORPUS**
11      v.

12   RICK HILL, Warden,

13            Respondent.

14   _____

15         Petitioner Terrell Love, a prisoner of the State of California, is serving an aggregate

16   sentence of sixty-one years to life in state custody for convictions arising out of a murder in

17   Oakland. Love filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 citing

18   three grounds for relief: (1) burdening Petitioner's Fifth Amendment right not to testify and

19   interfering with Sixth Amendment right to counsel by effectively conditioning expert testimony

20   and instruction on perfect and imperfect self-defense on Petitioner testifying at trial, (2)

21   ineffective assistance of appellate counsel, and (3) unsupported jury instructions that injected a

22   distorting confusion into the case.

23         Having considered the parties' papers and the accompanying record, the Court hereby

24   DENIES the petition.[1]

25                                    **BACKGROUND**

26   **I.     Procedural Background**

27         Petitioner was originally convicted in 1999 of first-degree murder, attempted murder,

28   and possession of a firearm by a felon. The murder occurred in 1995. This Court granted a

_____

[1] The Court DENIES Petitioner's request for oral argument. (Docket No. 24.)

United States District Court
For the Northern District of California

petition for writ of habeas corpus in 2008 after finding an error under *Batson v. Kentucky*, 476 U.S. 79 (1986). In 2009, Petitioner was retried and convicted of second degree murder, attempted murder, and possession of a firearm by a felon. The trial court sentenced Petitioner to sixty-one years to life in prison. On May 24, 2011 the California Court of Appeal affirmed Petitioner's convictions. On June 13, 2011, Petitioner's habeas petition related to the direct appeal was denied summarily by the California Court of Appeal. On September 14, 2011, the California Supreme Court denied review. On January 25, 2012, the California Supreme Court denied Petitioner's habeas petition summarily.

On November 30, 2012, Petitioner filed his petition for writ of habeas corpus in this Court. On November 13, 2013, the Court granted Respondent's motion to dismiss Claim IV as unexhausted and Claim V as procedurally defaulted. Respondent filed his answer on February 3, 2014. On September 26, 2014, Petitioner filed his traverse.

**II.   Factual Background**

The facts underlying the charged offenses as found by the Court of Appeal are set forth as follows:

*The People's Case*

The victim, Sean Johnson, sold drugs on Hayes Street in Oakland. His girlfriend, Collette McDaniels, testified that in the early evening of March 3, 1995, Johnson picked her up and drove her to an apartment on Hayes Street. McDaniels and one or two women who were at the apartment went down the street to a liquor store for beer. On their way back, they saw defendant pinning Johnson to the trunk of a parked car, holding a gun to his head. McDaniels described the weapon as a black semiautomatic handgun with a 10-inch barrel. McDaniels, who had no difficulty seeing defendant's face, heard him tell Johnson, "[Y]ou are going [to] die tonight."

Johnson told McDaniels to go inside the apartment. She saw three to five people across the street who were encouraging defendant threatening Johnson. She went inside the apartment. Johnson came in a few minutes later, and was upset. Apparently, he told her defendant was angry because Johnson was selling drugs in front of defendant's grandparents' house. Johnson called some friends on the telephone. Two men described as Johnson's "home boys," "T." (aka "Red Card") and "Mario," arrived at the apartment. Johnson pulled out a gun, that was apparently a double-barreled shotgun with an eight-inch barrel and a small handle, and gave it to one of the "home boys."

Later that evening, Johnson drove McDaniels, Red Card, and Mario to the Vintage Inn on Seminary Avenue. Either Red Card or Mario had the shotgun. They spoke to a man named "Chaka" in front of the Vintage Inn, but Chaka told Johnson he was too drunk to do anything for him.

United States District Court
For the Northern District of California

Johnson dropped off Mario and Red Card and drove off with McDaniels. After circling the block, Johnson stopped and got out of the car at the intersection of Fortune Way and Seminary. Johnson told McDaniels to park the car. She parked three car lengths down Fortune Way, facing the intersection with Seminary, as well as the Vintage Inn, which was on the far side of Seminary.

As she sat in the parked car, McDaniels saw defendant drive a car up Fortune Way, park, and get out. She saw defendant and Johnson approach each other in the street. Johnson raised his hands up to show they were empty, and said "Man, I ain't got no gat [i.e., gun]. Let's talk about this. . . ." Defendant replied, "Too bad. You should have thought about that before you came up here." Defendant then shot Johnson.

McDaniels testified she was looking directly at defendant when he shot Johnson with what appeared to be a semiautomatic handgun. Johnson was about 15 feet from defendant when he fired two shots. The victim fell to the ground. Defendant walked up to Johnson, kicked him to turn him over so that he was face up, and then fired a third shot into his head at close range.

McDaniels screamed and sounded the car horn. Defendant approached the car, came up to McDaniels' closed window, and pointed the gun at her. McDaniels ducked down on the seat. Defendant shot at her through the window, showering her with glass. The bullet struck her in the buttocks, causing her long-term injury.

McDaniels testified that when she first saw the man driving up Fortune Way and approaching Johnson, she did not know the person was defendant—but she recognized defendant when he came up to the parked car and pointed the gun at her. She also picked defendant's picture from a display of six photographs shown to her at the hospital after she was shot. Before the preliminary hearing in this matter, she picked defendant from a six-person live lineup.

On cross-examination, McDaniels testified that Johnson, Red Card and Mario were members of the gang known as the Black Guerilla Family (BGF). Johnson's BGF nickname was "Scar Face." She did not know if Chaka was a BGF member.

Lisa Travillian, Johnson's cousin, testified that she, McDaniels, and a third woman walked from the apartment building to the liquor store the afternoon of the day of the killing. As they walked back to the apartment, the women saw Johnson arguing with some men in the street. One of the men said, "Don't disrespect, don't disrespect." Johnson replied, "I am not going nowhere." One of the men said he was going to get his brother. Travillian and her companions went into one of the apartments in the building.

At some point, Travillian went back out into the street, where Johnson was still arguing with several men. A man she identified as defendant appeared with a black semiautomatic handgun which was about 11 inches long. Travillian knew Johnson did not have a gun because he just got back from court; she had never seen him with a gun. Johnson told Travillian to go inside the apartment. Defendant and the victim began "tussling." A man across the street said, "Shoot him man, just shoot him." Johnson later came into the apartment, and seemed "shocked" and "scared."

Johnson's body was found on Fortune Way about 44 feet from the intersection with Seminary. There was a spent slug in Johnson's clothing. Police officers found three .45 shell casings near McDaniels' car, and two more .45 casings between the car and Johnson's body. They also found a live round nearby. In another area, apparently across the intersection or further down one of the streets, police officers found four additional shell casings.

A criminalist testified the five .45 shell casings found in the area of McDaniels' car were fired from the same .45 gun, and the live round was ejected from that same weapon. The four shell casings found in the other area across the intersection were fired from the same .45 gun, but not the same gun which fired the five shells near McDaniels' car.

The autopsy physician testified that Johnson had three entry wounds: through and through wounds to the torso and head and a grazing wound on the inner forearm. The head wound was consistent with a .45 bullet and the weapon could not have been farther away than 18 to 24 inches when the head shot was fired. The head wound was fatal and the torso wound was likely to have been. Johnson's hands bore no smoke, powder, or stippling, suggesting that he had not fired a gun.

Chaka, whose real name was Milton Pringle, also testified for the People. Pringle and Johnson were both members of BGF at the time of the shooting.

Some time between 11:00 p.m. and midnight on the night of the murder, Pringle was near the entrance of the Vintage Inn. He saw defendant there, and 10 to 15 minutes later he saw Johnson with Mario, Red Card, and Pringle's nephew Horel. Red Card brought Johnson and Horel to Pringle and asked Pringle to mediate a dispute which Pringle thought was between Johnson and Horel. Apparently, neither man said anything to Pringle, and they both walked away down Seminary. Defendant walked across Seminary toward Fortune Way. Red Card or Mario told Pringle something was going to happen as a result of the "misunderstanding" between Johnson and defendant. Pringle assumed this meant a fight, a stabbing or a shooting.

About 20 to 25 seconds later, Pringle heard shots from down Fortune Way. He heard five or six shots, and then after a pause, two or three more.

Pringle was arrested for another crime six months after the shooting. He saw defendant at the courthouse. Defendant asked him to tell defendant's attorney that he was not present at the murder scene. Pringle also got two letters in jail from defendant, in which defendant told him he would put money on Pringle's books in the jail in exchange for Pringle telling an investigator that he witnessed the shooting and defendant was not the shooter.

Pringle testified at some length about the BGF. He confirmed that he had been a BGF member the night of the shooting. The BGF had a constitution, by laws, and a code of ethics. BGF members were required to take an oath which Pringle, with obvious reluctance, recited from the witness stand: "If I should break my stride or falter at my comrade's side, this oath shall kill me. . . . If I should submit to greed and lust or misuse the people's trust, this oath shall kill me. If I be slow to take a stand and show fear to any man, this oath shall kill me. If I become lax in discipline and in time refuse my hand, this oath shall kill me. Long live the spirit of Comrade Jesse George Jackson, long live the BGF."

Pringle testified that BGF members are required to help other members retaliate for assaults and threats against members, or for interference with a member's drug dealing activity. Such retaliation could be verbal and did not necessarily include violence.

Mario, whose full name was Mario Gaines, testified he was currently a minister and had left behind his involvement with drugs and alcohol. In addition to his trial testimony, the People admitted his testimony from the preliminary hearing and a tape recording of an interview with police officers on March, 22, 1995, which was played for the jury.

Gaines testified that on the day of the murder he was called to the Hayes Street apartment and Johnson's brother drove him there. The brother dropped him off on the street behind the apartment and told him to climb the fence. Inside the apartment, Gaines found Johnson "uptight" and upset. Johnson told Gaines he had been told not to sell drugs in front of someone's grandmother's apartment, and that he wanted to go and talk to the man who had threatened him. Johnson told Gaines the man who threatened him had been armed. Johnson said he wanted to resolve the matter peaceably because he had just got out of jail and did not want to go back.

At the preliminary hearing, Gaines testified Johnson had given him a 9mm handgun, and Gaines said he saw a sawed-off shotgun—presumably the same weapon seen by McDaniels—in the apartment. At trial, he testified Johnson gave him the handgun, but later testified that it was Johnson's brother who gave him the handgun. He also testified that he had only a general recollection that there was another gun in the apartment.

Johnson drove Gaines, Red Card, and McDaniels toward Seminary and Bancroft. Gaines testified at trial and the preliminary hearing that neither Johnson nor Red Card were armed while in the car. About three blocks from the Vintage Inn Johnson dropped off Gaines and Red Card, so they could follow Johnson "and kind of cold trail to see what was going on." Presumably, this is the point where McDaniels drove the car to the parking space.

The three men walked to the Vintage Inn where Johnson explained the situation to Pringle (aka Chaka). Red Card talked to Pringle about mediating the dispute between Johnson and the defendant. Pringle said he couldn't talk to defendant because defendant was stupid and hard headed.

Johnson walked away, across Seminary and down Fortune Way. Gaines saw Johnson walk down the center of Fortune Way, with his hands up at shoulder level with his palms forward. Johnson had nothing in his hands. He did not have a gun. Gaines heard Johnson say to a man, "I want to talk." Gaines saw the person that Johnson spoke to walk over to a car parked on Fortune Way, reach through the driver's window, then come back. In his interview with police, Gaines said he saw the person point a gun at Johnson and start shooting. Someone then started firing at Gaines from another area across the street. Gaines started running, but he did have a chance to see the armed man walk up to McDaniels' car and point the gun at it.

At the preliminary hearing, Gaines testified defendant was not the shooter. At trial, he testified he did not get a good look at the shooter with regard to his height, weight, build, clothing, or age.

Two investigators for the district attorney's office testified they had interviewed a man named Lloyd Morris, who told them he saw defendant shoot Johnson. Morris told one investigator he witnessed the "kill shot" to the head, and that he never saw Johnson with a gun.

*The Defense Case*

Defendant testified as follows. He was 27 at the time of the shooting in 1995. He had been convicted of possession for sale of drugs in 1989, and assault with a deadly weapon (a baseball bat) in 1990. In 1995, he sold drugs on the street in the Seminary and Hayes area, or by page. He admitted it was possible he told police officers he made about $500 a day selling crack cocaine.

**United States District Court**
For the Northern District of California

On the day of the shooting, his brother Mershell called him and told him Johnson and others were selling drugs in front of defendant's grandmother's house. Mershell had confronted the sellers, and they had become "belligerent" and "disrespectful." Mershell was upset. Defendant said he would come by and talk to Johnson because he and Johnson were friends.

He parked his car at the scene of the shooting and talked to Johnson, telling him he heard there was a misunderstanding between Johnson and Mershell. Defendant had prior conversations with Johnson about selling drugs in front of his grandmother's house, which he thought was disrespectful.

Johnson became "belligerent, hostile, and angry" and told defendant he did not "give a fuck" about Mershell. He told defendant, "Your brother don't own these streets. I am BGF, and I can sell my drugs anywhere I want to and I don't give a fuck." Defendant became frustrated and punched Johnson twice. They "tussled." Johnson grabbed defendant and defendant pushed Johnson away. Johnson ran away along the side of the apartment complex. This incident only lasted about 10 seconds. Defendant did not have a gun.

About 11:00 that night, defendant went to the Vintage Inn. He took a gun with him, but left it in his car because he thought he would be frisked going into the Vintage Inn. He left about 11:30. A woman told him some men outside were looking for him. He remembered the incident with Johnson and was scared because he knew Johnson belonged to the BGF. As he walked to his car he noticed Pringle.

Defendant walked across Seminary and down Fortune Way, where apparently his car was parked. He heard someone call out that they wanted to talk to him. He looked over his shoulder and saw Johnson and two others. He kept walking toward his car. Johnson again said he wanted to talk to him, and said he did not have a gun. Johnson held his left hand up in the air, but his right arm was hidden behind his back. As defendant reached his car, a man standing next to Johnson began shooting, firing four to six shots. Defendant ducked and went into his car to retrieve his gun. He crouched against the car and waited until the shooting stopped. He saw Johnson coming toward him holding a sawed-off shotgun in his outstretched arm. Defendant pointed his gun at Johnson, advanced toward him, and fired two or three times. Defendant tried to wound Johnson, not kill him. Defendant initially said he was no closer than 28 feet to Johnson, then narrowed the distance to 16 feet, then 3 or 4 feet.

After Johnson fell, defendant turned toward his car to leave. But he was still concerned about the man next to Johnson who had shot at defendant. Then a man standing on a corner started shooting at him. Defendant noticed McDaniels' car and saw there was someone in it. He couldn't tell if it was a man or a woman, but he ran toward the car thinking the person was another BGF member. As he reached the car, it looked like the person was leaning over as if to get a weapon, so defendant fired one shot into the car. He then ran back to his car, got in, and drove away. He threw his .45 handgun into a garbage bin.

Defendant admitted he had asked Pringle to say he was not the shooter. He also admitted two prior assaults. He hit his ex-girlfriend's sister with a baseball bat because she interfered with a fight between defendant and his ex-girlfriend and she owed him money. And while in jail in 1998 he and two other inmates fought with a fourth inmate, and defendant kicked him in the ribs. Furthermore, defendant admitted he had told police officers he was known as the type of person who "don't take no shit."

Daniel Vasquez is a former warden of San Quentin State Prison and a criminal justice consultant with over 30 years experience in the California Department of

6

1   Corrections (CDC). He testified for defendant as an expert in gangs and gang operations,
2   both in and out of prison. He testified that BGF members are sworn in with a "blood in
    and blood out" oath. This means "you are usually willing to spill blood to be part of . . .
3   BGF, and your blood will be spilled if you drop out." This entry oath is a separate oath
    from the one quoted above, which requires that a BGF member may forfeit his life if he
4   falters or doesn't kill an enemy. Members must be sophisticated criminals, and they
    refer to each other as "brother" or "comrade." If a BGF member is attacked or insulted
5   his fellow gang members will retaliate. If someone interfered with a BGF member doing
    his trade—i.e., drug dealing—on his "turf" in the streets, they "might be warned or . . .
6   might just be directly attacked." The BGF plans attacks on enemies, and operates in
    groups for superiority of force.

7                                        *Rebuttal*

8   Oakland Police Officer Andrew Barton also testified as a gang expert. He
9   testified BGF was "more decentralized and disorganized" on Oakland streets in the
    1990's than it had been in the 1980's, and that a request for help from a disrespected
10  gang member could be refused depending on the rank of the member within the gang
    hierarchy and other factors.

11  (Resp't Ex. 6 at 2-10.)

12                              **STANDARD OF REVIEW**

13      Federal district court review of habeas corpus petitions is governed by the Antiterrorism

14  and Effective Death Penalty Act of 1996 ("AEDPA"). Under the AEDPA, a district court may

15  not grant a habeas corpus petition that challenges a state conviction or sentence on the basis of a

16  claim that was reviewed on the merits in state court unless the state court's adjudication of the

17  claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application

18  of, clearly established Federal law, as determined by the Supreme Court of the United States; or

19  (2) resulted in a decision that was based on an unreasonable determination of the facts in light

20  of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

21      The AEDPA standard is "highly deferential" to state court decisions, which must be

22  "given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). "Clearly

23  established federal law" is defined as "the governing legal principle or principles set forth by

24  the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538

25  U.S. 63, 71-72 (2003). "A state court decision is 'contrary to' clearly established federal law 'if

26  the state court applies a rule that contradicts the governing law set forth in'" Supreme Court

27  decisions or "confronts a set of facts that are materially indistinguishable from a decision of"

28  the Supreme Court and nevertheless reaches a different result. *Menendez v. Terhune*, 422 F.3d

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1012, 1025 (9th Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). A state court decision constitutes an "unreasonable application of clearly established federal law, 'if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (quoting *Williams*, 529 U.S. at 413). The state court decision "must be more than incorrect or erroneous" and must be "objectively unreasonable" to constitute an unreasonable application of federal law. *Lockyear*, 538 U.S. at 75. The AEDPA "sharply limits the circumstances in which a federal court may issue a writ of habeas corpus to a state prisoner whose claim was 'adjudicated on the merits in State court proceedings.'" *Johnson v. Williams*, 133 S.Ct. 1088, 1094 (2013) (quoting 28 U.S.C. § 2254(d)). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication . . . to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). In cases where the federal court "must decide a constitutional issue not adjudicated on the merits in state court," the federal court "independently reviews the record to determine whether the state court clearly erred in its application of Supreme Court law." *Menendez,* 422 F.3d at 1025 (citing *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002)).

"Habeas relief is warranted only if the error had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *DePetris v. Kuykendall*, 239 F.3d 1057, 1061 (9th Cir. 2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).

"It is not within the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. Factual determinations by California state courts are entitled to a general "presumption of correctness." *Sumner v. Mata*, 449 U.S. 539, 547 (1981). The Petitioner has the "burden of rebutting the presumption by clear and convincing evidence." *Wood v. Allen*, 558 U.S. 290, 293 (2010).

The California Supreme Court denied Petitioner's petition for review without comment or citation to authority. (*See* Resp't Ex. 2.) In these circumstances, a district court "looks

United States District Court
For the Northern District of California

through" the unexplained decision to the last reasoned decision as the basis for the state court's

judgment. *Boyd v. Newland*, 467 F.3d 1139, 1143 n.3 (9th Cir. 2006); *Shackleford v. Hubbard*,

234 F.3d 1072, 1079 n.2 (9th Cir. 2000) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04

(1991)). In the instant case, the last reasoned decision relating to Petitioner's first and third

claims was the California Court Appeal's decision filed on May 24, 2011. (Resp't Ex. 2.)

Petitioner's second claim for ineffectiveness of appellate counsel was denied, without a

reasoned decision, by the California Supreme Court.

1.      **Petitioner's Fifth and Sixth Amendment Rights Were Not Violated by the Trial Court's Decision to Exclude Expert Testimony and Jury Instruction on Self-Defense at the Close of the People's Case.**

     a.      **Trial Court Did Not Erroneously Evaluate the Sufficiency of the Evidence to Support Admission of Expert Testimony and Self-Defense Jury Instruction and Did Not Effectively Force Petitioner to Testify.**

Petitioner contends that the trial court effectively forced him to testify because it

erroneously determined that the evidence that arose in the People's case was insufficient to

provide a basis for the admission of Daniel Vasquez' expert testimony. Petitioner also contends

that he was effectively forced to testify because the trial court erroneously determined that he

was not entitled to jury instructions on perfect and imperfect self-defense at the close of the

People's case. The California Court of Appeal determined that, based on the trial court record,

jury instructions, and admission of Vasquez' testimony was not effectively conditioned on

Petitioner testifying at trial.

California law regulates the admission of evidence at trial. A trial court can exclude

evidence for lack of foundation. Cal. Evid. Code § 402. Under California Evidence Code

section 352, it is within the trial court's discretion to "exclude evidence if its probative value is

substantially outweighed by the probability that its admission will . . . create substantial danger

of undue prejudice, of confusing the issues, or of misleading the jury." Cal. Evid. Code § 352.

California law also regulates jury instructions. "A defendant is entitled to a jury

instruction only if substantial evidence, or 'evidence sufficient to deserve consideration by the

jury,' supports the giving of that instruction." *Menendez*, 422 F.3d at 1028 (quoting *People v.

Barton*, 12 Cal.4th 186, 201 (1995)). Imperfect self-defense is recognized in California in

United States District Court

For the Northern District of California

1    homicide cases "where the killing resulted from an 'actual but unreasonable belief in the

2    necessity to defend against imminent peril to life or great bodily injury.'" *Id.* (quoting CALJIC

3    No. 5.17 (1995)). While the imperfect self-defense instruction does not require a showing that a

4    reasonable person believed the peril to be imminent, "the defendant must make some showing

5    that he actually believed the peril to be imminent." *Id.* "A state trial court's finding that the

6    evidence does not support a claim of imperfect self-defense is entitled to a presumption of

7    correctness on federal habeas review." *Id.* at 1029 (citing *Hartman v. Summers*, 120 F.3d 157,

8    161 (9th Cir. 1997)). "'Failure to give [a jury] instruction which might be proper as a matter of

9    state law,' by itself does not merit federal habeas relief." *Menendez*, 422 F.3d 1029 (quoting

10   *Miller v. Stagner*, 757 F.2d 988, 993 (9th Cir. 1985)).

11        Petitioner's argument that his Fifth and Sixth Amendment rights were violated is

12   premised on the Court finding that the trial court erred in its evaluation of the evidence and

13   effectively conditioned the admission of expert testimony and the disputed jury instruction on

14   Petitioner's decision to testify. Petitioner argues that the trial court erroneously determined that

15   the evidence that arose in the People's case was insufficient to introduce Vasquez' expert gang

16   testimony and establish a basis to instruct the jury on self-defense. Petitioner further asserts that

17   the Court of Appeal erred in its determination that admission of Vasquez' expert testimony and

18   instruction on self-defense was not effectively conditioned on Petitioner testifying.

19        The Court of Appeal summarized the factual background of Petitioner's claim as

20   follows:

21        After defendant identified Vasquez as a prospective defense witness, the People filed a
          motion in limine to exclude defendant from referring to any expert witness testimony,

22        for instance during voir dire or his opening statement, prior to a hearing under Evidence
          Code section 402: "The People can only guess that Mr. Vasquez's testimony would be

23        about the Black Guerilla Family, a prison gang to which the victim purportedly
          belonged. Without any showing of relevance it is impossible to weight the relevance

24        against the potential for prejudice to the People pursuant to Evidence Code section 352."

25        At the hearing on the motion, defense counsel stated Vasquez would testify that
          Johnson, Pringle, Gaines, and Red Card—a group counsel described as "this little group

26        that went out to kill Mr. Love"—were members of BGF, "and that's documented in the
          discovery." Vasquez would also testify about the BGF and related matters based on his

27        experience as warden of San Quentin State Prison.

28        Counsel argued the group's BGF membership was probative because of his theory of the
          case: "after the . . . altercation on Hayes Street . . . Johnson went around and, shall we

10

say, gathered up a number of his comrades from the [BGF] and proceeded over to Fortune and Seminary where they went to locate and kill" defendant.

The prosecutor argued that without evidence of defendant's knowledge of the BGF memberships of the group, there would be little relevance to the defense of self-defense: "I think we are a bit premature and I certainly can't make [defendant] testify." The prosecutor was also concerned that defense counsel would talk about Vasquez in his opening statement "and how he is going to tell [the jury] what horrible, horrible people the various witnesses are . . . ."

The trial court agreed the key point was defendant's knowledge: "So there would be no probative value for any expert testifying about BGF anything unless it is relevant on the issue, first, of self-defense and the defendant saying, yeah I know they were all members of the BGF . . . ." The court also expressed concern that references to expert testimony about BGF prior to the testimony of the People's witnesses who were or had been gang members would amount to "character assassination" and a suggestion that "they're bad actors because they're members of the BGF."

The trial court granted the motion to exclude reference to expert gang testimony in the defense opening statement, saying that to admit Vasquez' testimony the court needed more information about the defendant's knowledge of the BGF memberships and offers of proof of the nature of the BGF witnesses' testimony. The court would then have to make a determination under section 352.

Defense counsel promised at the motion hearing that he would not refer to a gang expert in voir dire or his opening statement, and seemed to promise, at the urging of the trial court, that he would not refer to BGF. But at the outset of his opening statement, defense counsel referred to Johnson as an ex-felon and a member of BGF, which he identified as a "violent prison gang" whose members "engage in community criminal activity in furtherance of their goals" when released from prison. Counsel outlined his theory of the case that, after the initial Hayes Street altercation, Johnson rounded up several BGF "comrades" and went after defendant in retaliation, with the intent to kill him. Counsel stressed that Johnson's "comrades" acted out of "loyalty" to assist Johnson "in an endeavor to go kill" defendant because Johnson was told that he could not establish a territory on Hayes Street to sell dope to support himself, having just got out of prison.

After the testimony of McDaniels, Travillian, and a few other witnesses, but just before the testimony of Pringle, the court and the parties again discussed the issue of Vasquez' testimony. Apparently, the prosecutor had requested a section 402 hearing in light of McDaniels' testimony that Johnson, Gaines and Red Card were BGF members. The court asked defense counsel to explain the relevance and probative value of the testimony. Counsel again stated his premise that Vasquez' testimony was probative on the issue of BGF retaliation for someone trying to exclude a member from selling drugs in his territory, and "the fact that this was a collection of BGF guys pulled together by . . . Johnson to go over and kill" defendant.

After a lengthy discussion with defense counsel, the court ruled that Vasquez' testimony, at that point in the case, would be more prejudicial than probative under section 352. The court noted, correctly, there had yet to be any evidence of self-defense and the probative nature of the BGF testimony would depend on defendant's knowledge: "[Y]our client hasn't gotten up and said because what does become probative on a self-defense is what was in the mind of the individual at the time he acted purportedly under self-defense and what was his intent and state of mind, . . . And if [defendant] says BGF, well, then . . . the issue for me at that point becomes not one of is it relevant that they're in the BGF, but it is whether or not . . . under [section] 352, we want to bring an expert witness in to essentially say, [h]ere is how they operate, that's

11

what they do. And as far as I am concerned, if [defendant] knows what they do and how they operate, that's kind of probative. But I am not ruling on that yet because that's not before me." The court again expressed concern that Vasquez' testimony would be "improper character evidence" and an "improper impeachment tool" of prosecution witnesses—the jury would think they were "bad people" because they belonged to BGF.

The court told defense counsel he could raise the issue at a later point in the case. The court also told counsel that even if defendant testified, his testimony might not be sufficient to allow Vasquez' testimony.

After the testimony of Pringle and Gaines and several other witnesses, the People rested. Defense counsel again raised the issue of Vasquez' testimony, stating he wanted the court's decision on whether to allow the testimony before he decided whether defendant should testify. The court responded: "[L]et me just make it very clear, whatever my ruling is about Vasquez, I am not in any way, shape, or form at all in my mind intimating, stating, thinking even about whether [defendant] testifies." The court stated it was viewing Vasquez' testimony as a separate issue, involving, in part, as-yet-undisclosed CDC records—which, presumably, Vasquez would explain to the jury—which might impeach Gaines by showing that he was in fact a BGF member, despite his denial on the stand. The court said, "I am not at all considering whether the defendant testifies or not. That is solely his right to and solely his right not to. So whatever I rule regarding Mr. Vasquez has nothing to do with whether I view the defendant having the right to testify or not testify and he has absolutely that right."

The trial court elaborated: "[I]f [defendant] were to testify and [defendant] were to say that one of the reasons—if he put forth the self-defense, which you have indicated that he is likely to do, and certainly it is probative, the things [defendant] would have had in his mind at the time he acted ostensibly in self-defense, then if one of those factors were the fact that he thought these people were BGF and this is how BGF does and acts, then that certainly would bring that issue before the court.

I never ever said that that was absolutely a predicate, however, to my deciding whether or not Mr. Vasquez would or would not be allowed to testify. It would simply be that if your client did testify to that effect, then that would be a factor I would definitely consider in deciding whether or not Mr. Vasquez would testify. I can't tell you, nor would I even know how you are going to present your defense case. And clearly since the defendant has an absolute right not to testify, I could never predicate my decisions about your other witness on whether he did or didn't testify. I was simply outlining that if, in fact, that were the testimony, assuming he waived his . . . Fifth Amendment right not to testify, and did testify, that I would consider that in determining whether Mr. Vasquez could testify . . ."

Defense counsel declined the court's offer for an immediate ruling, and asked that the matter be continued so he could obtain the CDC record. Counsel made it clear that the CDC records would affect his decision whether to have defendant testify.

Subsequently, after in camera review, the trial court granted limited discovery of some of the CDC records. After that, defendant testified. Because defendant testified that Johnson told him he was a member of BGF, and that made him scared when the woman in the Vintage Inn told him a group of men were looking for him and made him think a BGF member was in McDaniels' car, the trial court ruled there was sufficient evidence of defendant's state of mind to allow Vasquez' testimony about BGF and the way they operate. Such testimony, especially about BGF operations—presumably including retaliation—would corroborate defendant's fear that Johnson and his friends were coming after him and would be pertinent to the defense of self-defense. Vasquez then testified.

United States District Court

For the Northern District of California

1    (Resp't Ex. 6 at 10-14.)

2         The Court of Appeal reasoned that the trial court's language made it expressly clear that

3    the court did not condition the admission of expert testimony on Petitioner's decision to testify.

4    This Court agrees. The trial court expressed that in ruling on whether to allow Vasquez'

5    testimony, the court was "not at all considering whether the defendant testifies or not." (8 RT

6    1920.) The court noted that it "is solely [the defendant's] right to and solely his right not to"

7    testify. (*Id.*) The trial court went on to state that in "deciding whether or not Mr. Vasquez would

8    or would not be allowed to testify" Petitioner's testimony was not an absolute predicate. (8 RT

9    1921.) The trial court only stated that if Petitioner testified that he acted in self-defense out of

10   knowledge that those attacking him were BGF members, and he knew that BGF members act in

11   a certain way, it "would be a factor [the court] would consider in deciding whether or not Mr.

12   Vasquez would testify." (*Id.*) Instead of conditioning the admission of Vasquez' testimony on

13   Petitioner's decision to testify, the trial court correctly considered the probative value of

14   Vasquez' testimony versus the potential prejudice it would create (under California Evidence

15   Code section 352). This is consistent with the trial court's right to exclude evidence for lack of

16   foundation under state law. *See* Cal. Evid. Code § 402.

17        Additionally, the Court of Appeal found that while, in general, entitlement to instruction

18   on self-defense and imperfect self-defense can be shown from only the People's case, "that was

19   not the case here." (Resp't Ex. 6 at 15.) The Court of Appeal's statement of the facts noted that

20   the People's case showed that Johnson approached Petitioner unarmed and with his hands in the

21   air prior to being shot. Then Petitioner "gunned him down and . . . delivered a kill shot to his

22   head while he lay on the ground wounded." (*Id.*) These facts are not at all consistent with

23   Petitioner's theory of self-defense. In accordance with state and federal law, the trial court did

24   not agree to give instruction on perfect and imperfect self-defense. *See Menendez*, 422 F.3d at

25   1028-29 (holding that the state court correctly determined that state law did not allow for an

26   imperfect self-defense jury instruction and thus Petitioners' constitutional rights were not

27   violated). There was not substantial evidence to support a jury instruction on self-defense and

28   there is nothing in the record that suggests that the trial court erred in its refusal to give the self-

13

1    defense instructions in the absence of new evidence in the defense case. Additionally, the trial

2    court's statements contradict Petitioner's assertion that the trial court "virtual[lly] demand[ed]"

3    Petitioner testify. (Pet. ¶ 11.) The trial court simply noted at the close of the People's case that

4    there was not substantial evidence to support an instruction on self-defense. (9 RT 1992.) The

5    trial court did not state that it was necessary for Petitioner to testify for the court to give the

6    instruction. Instead, the trial court stated that at the close of the People's case, the court did not

7    find that the "evidence would substantiate a giving of the self-defense instruction" at that point,

8    but that the court would "revisit" the decision to give certain instructions "once all the evidence

9    is in in this case." (9 RT 1992-1993.)

10         The Court of Appeal's factual finding that the trial court did not effectively force

11   Petitioner to testify in order to admit expert testimony and receive a jury instruction on self-

12   defense was not "based on an unreasonable determination of the facts in light of the evidence

13   presented in the State court proceeding." *See* 28 U.S.C. § 2254(d)(2). The state court's

14   determination is presumed to be correct and given deference because it relates to Petitioner's

15   constitutional claims. *See Menendez*, 422 F.3d at 1029. The evidence before the trial court did

16   not favor Petitioner's theory of self-defense or provide Vasquez' testimony with the required

17   probative value under state evidence law. In light of the record in the case, the Court finds that

18   the trial court did not err in evaluating the sufficiency of the evidence and accordingly did not

19   condition admission of expert testimony and self-defense jury instruction on Petitioner's

20   decision whether to testify.

21         **b.    No Violation of Clearly Established Federal Law Even if Admission of
            Expert Testimony and Self-Defense Jury Instruction was Effectively
22          Conditioned on Petitioner Testifying.**

23         Petitioner contends that the state trial court violated his Fifth Amendment right to not

24   testify and Sixth Amendment right to counsel by "effectively conditioning" the admission of

25   Daniel Vasquez' expert gang testimony, and instruction on perfect and imperfect self-defense

26   on Petitioner's decision to testify. Even if Petitioner presented a sufficient factual basis to

27   indicate that he testified because it was the only way to admit Vasquez' testimony and receive a

28   self-defense jury instruction, authority shows that Petitioner was not improperly compelled to

United States District Court

For the Northern District of California

testify and there was no Fifth or Sixth Amendment violation.  Although the Court has found the premise to be factually unsupported by the record, for purposes of addressing all alternatives, the Court will address this constitutional issue. For purposes of this analysis, the Court will assume that Petitioner was able to show that the admissibility of Vasquez' testimony and self-defense jury instruction were effectively conditioned on his testimony.

The Fifth Amendment guarantees that "[no] person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To qualify for the Fifth Amendment privilege, the communication must be testimonial, incriminating, and compelled. *Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt Cnty.*, 542 U.S. 177, 189 (2004). "A criminal defendant need not take the stand and assert the privilege at his own trial." *Salinas v. Texas*, 133 S. Ct. 2174, 2179 (2013). The defendant's right against self-incrimination is the right "to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." *Brooks v. Tennessee*, 406 U.S. 605, 609 (1972) (quoting *Malloy v. Hogan*, 378 U.S. 1, 8 (1964)). "Whether the defendant is to testify is an important tactical decision as well as a matter of constitutional right." *Id*. at 613.

The Constitution "guarantees a criminal defendant a meaningful opportunity to introduce relevant evidence on his behalf." *Crane v. Kentucky*, 476 U.S. 683 (1986). In *Brooks*, the Supreme Court held that a Tennessee statute that required that a criminal defendant testify prior to all other defense testimony, or not at all, was a violation of the defendant's Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to the "guiding hand of counsel." *Brooks*, 406 U.S. at 612-13. The Supreme Court noted that "a defendant may not know at the close of the State's case whether his own testimony will be necessary or even helpful to his cause." *Id.* at 610. "By requiring the accused and his lawyer to make" the choice to testify "without an opportunity to evaluate the actual worth of their evidence [a] statute restricts the defense—particularly counsel —in the planning of its case." *Id.* at 612. "The accused and his counsel may not be restricted in deciding whether, and when in the course of presenting his defense, the accused should take the stand." *Id.* However, this requirement does not "curtail in any way the ordinary power of a trial judge to set the order of proof." *Id.*

United States District Court

For the Northern District of California

1    Furthermore, the requirement "does not constitute a general prohibition against a trial judge's

2    regulation of the order of trial in a way that may affect the timing of a defendant's testimony."

3    *Harris v. Barkley*, 202 F.3d 169, 173 (2d Cir. 2000).

4          In a case that distinguished *Brooks*, the Ninth Circuit held that a trial court may require a

5    defendant to lay a foundation prior to introducing testimony even when it can "only be

6    accomplished if the [defendant] testified." *See Menendez*, 422 F.3d at 1032; *see also United*

7    *States v. Singh*, 811 F.2d 758, 762 (2d Cir. 1987) (holding that trial court may refuse to accept

8    proffered testimony of witnesses until a proper foundation is laid). In *Menendez*, Petitioners

9    brought a habeas petition in federal court based on alleged violations of their Fifth and Sixth

10   Amendment rights when the trial court refused to give Petitioners' requested imperfect self-

11   defense jury instruction and excluded allegedly relevant testimony prior to Petitioners

12   testifying. *Id.* at 1030-33. The court barred the relevant witnesses testimony for lack of

13   foundation. *See id.* at 1031. The Ninth Circuit noted that the Sixth Amendment right to present a

14   defense "is subject to reasonable restrictions 'to accommodate other legitimate interests in the

15   criminal trial process.'" *Id.* at 1033 (quoting *United States v. Scheffer*, 523 U.S. 303, 308

16   (1998)). A "trial judge may exclude or limit evidence to prevent excessive consumption of time,

17   undue prejudice, confusion of the issues, or misleading the jury." *Id.* "The trial judge enjoys

18   broad latitude in this regard, so long as the rulings are not arbitrary or disproportionate." *Id.* A

19   trial court's commentary about "what evidence might constitute a foundation [does] not infringe

20   on Petitioner's right to decide whether to testify." *Id.* at 1032.

21         Petitioner relies solely on the Supreme Court's decision in *Brooks* to argue that the

22   Court of Appeal's denial of his habeas petition was incorrect and that the state court's rulings

23   were contrary to, or an unreasonable application of clearly established federal law.

24         Petitioner contends that the trial court's ruling violates his Fifth and Sixth Amendment

25   rights under the Supreme Court's holding in *Brooks*. However, *Brooks* can be distinguished

26   from the instant case. Under the Tennessee statute at issue in *Brooks*, the defendant was not able

27   to make the choice of whether to testify in the required "unfettered exercise of his own will."

28   *Brooks*, 406 U.S. at 610. The defendant was not afforded the opportunity to fully assess the

United States District Court
For the Northern District of California

1   value of taking the stand prior to the point at which he was required to assert his right to remain

2   silent if he wished to do so. *See id.* In other words, under the facts in *Brooks*, the defendant was

3   pressured into taking the stand "by foreclosing later testimony if he refuse[d]." *See id.* at 612.

4       Here, unlike in *Brooks*, the trial court did not restrict counsel's ability to plan its case or

5   improperly pressure Petitioner to testify. The court made clear that Petitioner's testimony might

6   not even be sufficient to allow Vasquez to testify. (8 RT 1920-21.) The critical distinction

7   between *Brooks* and the present matter is that here, like in *Menendez*, Petitioner had the

8   opportunity at every stage of the trial to decide whether or not to testify. *See Menendez*, 422

9   F.3d at 1032. The Court did not threaten to take this right away at any point during the trial.

10  Unlike in *Brooks*, Petitioner was aware that his testimony would help his case and was likely

11  necessary to admit the desired evidence and to receive the desired jury instructions. *See Brooks*,

12  406 U.S. at 613. When the defendant is the only one capable of laying a foundation for expert

13  testimony, it does not violate *Brooks* for the trial court to effectively condition the admissibility

14  of expert testimony on the defendant's decision to testify and the content of his testimony. *See*

15  *Menendez*, 422 F.3d at 1032. The trial court alluded that testimony from Petitioner would likely

16  help provide sufficient evidence for a self-defense instruction and probative foundation for the

17  admission of Vasquez' testimony. (8 RT 1921.) It is well established that the trial court's

18  commentary in the underlying state case only regulated the admission of evidence and did not

19  infringe on Petitioner's constitutional rights. *See Menendez*, 422 F.3d at 1032.

20      Furthermore, like in *Menendez*, here the true issue is not whether Petitioner was required

21  to testify, but "whether the testimony of the relevant witness was admissible despite" a lack of

22  the requisite probative value. *See id.* at 1031. The trial court merely excluded evidence for lack

23  of probative value under the broad latitude it is afforded under the Sixth Amendment. The Court

24  of Appeal correctly stated that Petitioner was not improperly compelled or forced to testify but

25  that the "realities of the case impelled defendant to testify." (Resp't Ex. 6 at 15.) If Petitioner

26  was "effectively compelled," it was only because there was no other adequate manner to

27  establish Petitioner's knowledge of the BGF, and his fear of imminent harm that was required to

28

1    provide probative foundation for the expert testimony and to establish entitlement to a self-

2    defense jury instruction.

3           Additionally, for similar reasons, Petitioner's constitutional rights were not violated by

4    the trial court's refusal to give self-defense jury instructions. First, as previously noted, the

5    Court agrees with the trial court and Court of Appeal that there was insufficient evidence to

6    support self-defense jury instructions at the close of the People's case. Second, Petitioner's

7    constitutional right to present a defense is subject to reasonable restrictions. *See Menendez*, 422

8    F.3d at 1033. Petitioner's right to testify was not unconstitutionally restricted under the rule

9    announced in *Brooks*, and it was only made clear that his testimony could provide the

10   substantial evidence necessary to instruct the jury on self-defense under California law. *See*

11   *Brooks*, 406 U.S. at 613. Self-defense jury instructions were excluded at the time due to the

12   same lack of evidence that initially barred Vasquez' testimony. The trial court's determination

13   that Petitioner was not entitled to perfect and imperfect self-defense jury instructions was not an

14   error and thus does not constitute a violation of the Constitution. *See Menendez*, 422 F.3d at

15   1029-30.

16          The Court finds that in light of *Brooks* and *Menendez*, the state court proceedings did

17   not violate Petitioner's Fifth Amendment right to not testify and Sixth Amendment right to

18   counsel. Petitioner retained his right to decide whether or not to testify throughout the trial.

19   **2.      Petitioner Received Effective Assistance of Counsel.**

20          Next, Petitioner contends that he was not provided effective assistance of counsel

21   because his appellate counsel failed to present the claim that Petitioner's testimony was coerced

22   by the trial court's incorrect assessment of the sufficiency of the evidence to support a self-

23   defense instruction. The Court of Appeal barred this claim because Petitioner failed to present

24   this argument in his opening brief.

25          The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant

26   the effective assistance of counsel on his first appeal as of right. *Evitts v. Lucey*, 469 U.S. 387,

27   392 (1985). "When a convicted defendant complains of the ineffectiveness of counsel's

28   assistance, the defendant must show that counsel's representation fell below an objective

**United States District Court**
For the Northern District of California

standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment in a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. Petitioner must be able to show that appellate counsel acted unreasonably in failing to discover and brief a merit-worthy issue on appeal. *Moormann v. Ryan*, 682 F.3d 1102, 1106 (9th Cir. 2010). "Any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Strickland*, 466 U.S. at 691. If "a deficiency in attorney performance" is alleged, there is a "general requirement that the defendant affirmatively prove prejudice." *Id.* In order to show prejudice and succeed on an ineffectiveness of counsel claim, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Woodford*, 537 U.S. at 23 (quoting *Strickland*, 466 U.S. at 694).

The California Court of Appeal alternatively held that even if Petitioner's claim that the trial court effectively conditioned a self-defense jury instruction on Petitioner testifying was not barred, there was inadequate evidence to support a jury instruction on perfect and imperfect self-defense. (Resp't Ex. 6 at 15 n.7.) This Court has already determined that Petitioner was not entitled to perfect and imperfect self-defense jury instructions and that this barred claim did not have merit under its analysis of Petitioner's first claim. Thus, this Court finds that the Court of Appeal's alternative holding was reasonable under the law. Petitioner was unable to show that there was a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. The Court finds that Petitioner was unable to affirmatively prove prejudice and received effective assistance of appellate counsel.

**3.      Jury Instruction Did Not Inject a Distorting Sense of Confusion Regarding the Law of Self-Defense Into the Case, and Did Not Infringe On Petitioner's Sixth and Fourteenth Amendment Rights.**

Petitioner argues that the trial court's jury instructions on self-defense by an aggressor (CALJIC No. 5.54) and contrived self-defense (CALJIC No. 5.55) were unsupported by the

1   evidence and injected a distorting confusion regarding the law of self-defense into the case.

2   Petitioner contends that these instructions violated his Sixth and Fourteenth Amendment rights.

3       A challenge to jury instruction solely as an error under state law does not state a claim

4   cognizable in federal habeas corpus proceedings. *See Estelle*, 502 U.S. at 71-72. To obtain

5   federal collateral relief for errors in the jury charge, a petitioner must show that the "ailing

6   instruction by itself so infected the entire trial that the resulting conviction violates due

7   process." *Id.* at 72. "It must be established not merely that the instruction is undesirable,

8   erroneous, or even 'universally condemned,' but that it violated some [constitutional right]."

9   *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). "The instruction may not be judged in

10  artificial isolation, but must be considered in the context of the instructions as a whole and the

11  trial record." *Estelle*, 502 U.S. at 72. In reviewing ambiguous instructions, "we inquire whether

12  there is a reasonable likelihood that the jury has applied the challenged instruction in a way that

13  violates the Constitution." *Id.*

14      A habeas petitioner is not entitled to relief unless the instructional error "had substantial

15  and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. The

16  proper question in assessing harm in a habeas case is, "do I, the judge, think that the error

17  substantially influenced the jury's decision?" *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). If

18  the Court is convinced that the error did not influence the jury, or had but very slight effect, the

19  verdict and the judgment should stand. *Id.* at 437. There is a "strong policy against retrials years

20  after the first trial where the claimed error amounts to no more than speculation." *Boyde v.*

21  *California*, 494 U.S. 370, 380 (1990). "Differences among [jurors] in interpretation of

22  instructions may be thrashed out in the deliberative process, with commonsense understanding

23  of the instructions in the light of all that has taken place at the trial likely to prevail over

24  technical hairsplitting." *Id.* at 381.

25      Petitioner claims that CALJIC No. 5.54 and CALJIC No. 5.55 were not supported by the

26  evidence in this case. However, the Court of Appeal determined that any possible error was

27  harmless:

28          These instructions are standard in self-defense cases and the trial court instructed the
            jury that whether some instructions would apply "will depend upon what you find to be

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

the facts. Disregard any instruction which applies to facts determined by you not to exist. Do not conclude that because an instruction has been given, I am expressing an opinion as to the facts." Jurors are assumed to have followed all of these instructions.

(Resp't Ex. 6 at 17.)

The trial court did not misstate the law or deviate from the standard jury instruction. Petitioner claims that the instructions left the jury with the erroneous impression that they could consider Petitioner's earlier confrontation with Johnson on Hayes Street as the initial act of aggression. Further, Petitioner claims that this consideration would place an incorrect and heavy burden on his self-defense claim. In other words, Petitioner claims that the jury instructions were reasonably likely to induce jurors to treat Petitioner as an aggressor. (Pet. ¶ 6.) However, the trial court made explicitly clear that the jury should not consider instructions that did not apply to the facts of the case. (Resp't Ex. 6 at 17.) If the jury did not believe that the facts existed to warrant these instructions, that Petitioner was not the person who initiated the assault, Petitioner was not harmed by their inclusion. The jury was directed by the trial court to disregard these instructions if it did not believe that Petitioner initiated the assault. The appellate court stated that "jurors are assumed to have followed all of the instructions." *Id.* This Court sees no reason not to defer to this assumption.

Additionally, there is not a "reasonable likelihood" that the jury misapplied the instructions and incorrectly assumed that Petitioner initiated the assault at the earlier Hayes Street incident. The Court of Appeal noted that these jury instructions are used in most self-defense cases. Petitioner's assertion of error amounts to no more than speculation. In the absence of evidence, the Court cannot assume that it was reasonably likely that the jury wrongfully reached its verdict on the basis of the Hayes Street incident and accordingly placed an unwarranted burden on Petitioner's claim of self-defense. Furthermore, the jury instruction on self-defense by an aggressor simply defines when the right of self-defense can be available to a person who initiated an assault. *See* CALJIC No. 5.54. The instruction did not inject the Hayes Street incident as the initiation of the assault but instead was consistent with the prosecution's factual case that Petitioner initiated the assault on Fortune Way when he "gunned down" Johnson. (Resp't Ex. 6 at 18.) Furthermore, CALJIC 5.54 provides that "self-defense is

United States District Court

For the Northern District of California

1   only available to a person who initiated an assault if" certain conditions are satisfied. As

2   separate assaults, common sense suggests that the assault that killed Johnson was initiated on

3   Fortune Way, not at the incident several hours earlier on Hayes Street. *See Boyde*, 494 U.S. at

4   381.The trial court never instructed the jury that the Hayes Street incident should have legal

5   bearing on self-defense. Applying the relevant standard, it is unlikely that the jury interpreted

6   the standard instructions to suggest that Petitioner's act of aggression at Hayes Street

7   automatically placed a burden on his claim of self-defense.

8          Petitioner cites to the prosecutor's closing statement at trial as indicative that the

9   challenged instructions misled the jury regarding Petitioner's claim of self-defense. However,

10  Petitioner's assertion is baseless for two reasons. First, the prosecutor's closing statement

11  addressed CALJIC No. 5.17, the jury instruction on imperfect self-defense. (11 RT 2525.) The

12  allegedly misleading statement did not discuss instruction on self-defense by an aggressor, or

13  contrived self-defense, which Petitioner challenges here. Second, the prosecutor only addressed

14  a possible set of factual circumstances under which Johnson acted in self-defense and

15  accordingly Petitioner's claim of imperfect self-defense was foreclosed. The prosecutor

16  explained how the Hayes Street incident could effect Petitioner's imperfect self-defense claim

17  under CALJIC No. 5.17. (*Id.*) Specifically, the prosecutor referred to a scenario where

18  Petitioner could not claim self-defense because his actions on Hayes Street earlier that day had

19  caused Johnson to attack Petitioner on Fortune Way with reasonable belief that Petitioner was

20  about to use deadly force on him, in other words to act in self defense. The prosecutor did not

21  assert or imply that Petitioner's actions on Hayes Street constituted the initiation of the Fortune

22  Way assault under CALJIC No. 5.54. The Court of Appeal noted that under CALJIC No. 5.17,

23  Petitioner's claim of self-defense would only be foreclosed under certain circumstances:

> But the language would only apply if the facts showed that Johnson had a reasonable belief that defendant was about to use deadly force upon him and, because of that belief, attacked defendant. The Hayes Street altercation was too far removed from the time of the shooting to have a realistic impact on Johnson's belief as to what was transpiring at that time. The jury found that Johnson did not attack defendant. The jury was clearly instructed on the basic principles of self-defense and heard, and believed, evidence that defendant gunned down an unarmed man. We see no error.

28  (Resp't Ex. 6 at 18.)

22

1    The Court of Appeal found that the portion of the instruction that would foreclose

2    Petitioner's claim of self-defense only applied if the jury found that Johnson attacked Petitioner.

3    However, the Court of Appeal determined that the jury found that Johnson did not attack

4    Petitioner. The jury found "that [Petitioner] gunned down an unarmed man." *Id.* There was also

5    substantial evidence that Petitioner initiated the assault on Fortune Way. Accordingly, any error

6    would not have had a substantial and injurious influence on the resulting verdict. *See DePetris*,

7    239 F.3d at 1061.

8    There is nothing in the record or disputed jury instructions to suggest that the jury was

9    improperly influenced by the inclusion of the self-defense by an aggressor and contrived self-

10   defense instructions. It is not substantially likely that this alleged error influenced the jury's

11   decision. It is only speculation that the jury foreclosed or incorrectly burdened the defense of

12   self-defense because of the Hayes Street incident. The Court finds that there was no error from

13   instruction on self-defense by an aggressor and contrived self-defense, and that the trial court

14   proceedings did not violate Petitioner's Sixth and Fourteenth Amendment rights.

15                                          **CONCLUSION**

16   For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  Rule

17   11(a) of the Rules Governing Section 2254 cases now requires a district court to rule on

18   whether a petitioner is entitled to a certificate of appealability in the same order in which the

19   petition is denied.  Petitioner has failed to make a substantial showing that his claims amounted

20   to a denial of his constitutional rights or demonstrate that a reasonable jurist would find the

21   denial of his claims debatable or wrong.  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

22   Consequently, a certificate of appealability is not warranted in this case.  A separate judgment

23   shall issue, and the Clerk of the Court shall close the file.

24   **IT IS SO ORDERED.**

25   Dated: August 6, 2015                    _____

26                                            JEFFREY S. WHITE
                                             UNITED STATES DISTRICT JUDGE
27

28